370 A.2d 1172

**COMMONWEALTH of Pennsylvania**

v.

**William Mark CUNNINGHAM, Jr.**
**Appellant (two cases).**

Supreme Court of Pennsylvania.

Argued May 6, 1975.

Decided Feb. 28, 1977.

578

Smith B. Gephart, Harrisburg, for appellant.

Marion E. MacIntyre, Deputy Dist. Atty., Gaylor E. Dissinges, Harrisburg, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY and NIX, JJ.

## OPINION OF THE COURT

NIX, Justice.

On May 15, 1974, appellant was convicted of first degree murder and burglary in connection with the killing of a young housewife in suburban Harrisburg in May of 1972. Post-trial motions were filed and denied and the appellant was sentenced to life imprisonment.

Appellant raises three major issues on appeal to this Court: 1) whether the suppression judge erred as a matter of law in ruling that the June 13, 1973 signed confession of appellant was admissible at trial despite allegations that it was obtained as a result of coercion; 2) whether the June 13, 1973 confession, if not the result of coercion, was tainted by prior allegedly illegally-obtained statements, more precisely statements given to police on May 24, 1973 and June 7, 1973; and 3) whether the trial judge erred in prohibiting defendant from introducing testimony concerning the use of the polygraph examination which was offered to show that coercive tactics were used in securing the statement of June 7, 1973.

The testimony established that the victim was a 27-year-old housewife who was found stabbed to death at the entrance of the garage to her home. She had not been sexually molested and nothing was reported missing from the house. Despite an intensive police investigation it was not until approximately a year later that the first break-through came towards a solution of the case. On April 25, 1973, in the course of investigating individuals with a prior history of "violence, sexual motivation or surreptitious entry," police were at Susquehanna Township High School, located in the immediate vicinity of the scene of the crime, talking with friends and classmates of one Ronald Hoffman, one of the individuals with such a record of criminal activity. One of Hoffman's associates who was interviewed was the appellant, William Cunningham, a 17-year-old Special Education student in the 11th grade.

On April 25, 1973, and again on May 24, 1973, appellant spoke with state policemen and discussed Hoffman's possible involvement in the crime. On June 7, 1973, with the knowledge and consent of his parents, appellant agreed to submit to a polygraph examination to enable the police officials to assess the truth of the allegations made by appellant against Hoffman. Following that examination, which was preceded by proper *Miranda* warnings and the signing by appellant of a polygraph waiver form, appellant first implicated himself by admitting that he was present at the home of the victim on the day in question, that he observed Ronald Hoffman stab the victim, but that his function was merely that of a lookout while Hoffman burglarized the home.

The next day appellant was arraigned on burglary charges and on June 9th Ronald Hoffman was arrested and charged with murder. On June 13, 1973, at 2:00 P. M., appellant was interviewed in the District Attorney's office for the expressed purpose of preparing the testimony that would be used against Hoffman at his prelimi-

nary hearing scheduled for June 15th. The defendant was advised of his constitutional rights and told that he could be charged with murder. During the interview, after being confronted with certain inconsistencies in his prior statements, the appellant broke down and admitted that Hoffman had not been involved in the commission of the crime but that he, Cunningham, was the sole perpetrator. The interview was concluded at 4:15 P.M., after the District Attorney had suggested that the appellant's parents be called. Although appellant objected, his parents were then brought to the District Attorney's office. They employed an attorney who appeared and conferred with the appellant. At 6:30 P.M., a formal stenographically-transcribed confession was given in the presence of the appellant's attorney and it is this statement which was presented at trial and whose admissibility is now being questioned.

Prior to trial, defense counsel filed timely motions to suppress the statements of May 24, June 7 and June 13, 1973, on various grounds. The motions were heard and denied after a three-day suppression hearing.

■■ It is axiomatic that a confession to be valid must be given free of any physical or psychological coercion which might interfere with one's will to resist. *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L. Ed.2d 1037 (1961); *Commonwealth v. Cockfield*, 465 Pa. 415, 350 A.2d 833 (1976); *Commonwealth v. Goodwin*, 460 Pa. 516, 333 A.2d 892 (1975). Further, where the custodial interrogation involves the waiver of constitutional rights guaranteed under the Fifth and Sixth Amendments, the record must clearly demonstrate that the accused was fully apprised of his rights and knowingly made the decision to waive them. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Commonwealth v. Purvis*, 458 Pa. 359, 326 A.2d 369 (1974); *Commonwealth v. Simms*, 455 Pa. 599, 317 A.2d

265 (1974); *Commonwealth v. Riggins,* 451 Pa. 519, 304 A.2d 473 (1973).

## I. THE COUNSELED INTERVIEW OF JUNE 13, 1973

Appellant asserts that the signed statement which was introduced against him was involuntarily given and thus should have been suppressed. This statement was obtained during a counseled interview which took place during the evening hours of June 13, 1973. As has been previously noted, appellant first admitted complicity in the murder on June 7, 1973. In this statement he described his participation in the incident as a lookout and denied responsibility for the actual stabbing of the victim. After these admissions, he was charged only with the crime of burglary. As a result of the information supplied by appellant, Ronald Hoffman was arrested and charged with murder. It is also evident that the Commonwealth's case against Hoffman was dependent solely upon the testimony of appellant.

On June 13th, appellant was taken to the District Attorney's office at 2:00 P.M. for the purpose of preparing him to testify as a Commonwealth witness against Hoffman at the latter's preliminary hearing. It was during this discussion that appellant volunteered the information that he killed the victim and that Ronald Hoffman was not involved in the crime. Up to the time of this admission Hoffman, and not appellant, was the target defendant as to the slaying of Ms. Karen Dockray. When the police became aware of this change of posture in the case they insisted that appellant contact his parents.

When notified of the situation, the parents of appellant obtained counsel who met and conferred with appellant. Thereafter, a counseled interview took place during which the statement, which is now challenged, was prepared and signed.

584

■ At the outset of our consideration of appellant's challenge to this statement it must be noted that since counsel was present and appellant was provided a full opportunity to confer with him, it is obvious that the Sixth Amendment right to counsel has been satisfied. The record also establishes that prior to the commencement of the counseled interview appellant had been apprised of his Fifth Amendment rights by police officials and his privately retained attorney. The facts of this case do not provide the slightest justification for a challenge to the waiver of the Fifth Amendment right as being a knowing one.[1]

■ Finally, there is not a scintilla of evidence upon which to predicate a challenge to the voluntariness. At no point has appellant identified the presence of a single coercive influence during the interrogation in question. To the contrary, the presence of counsel at that time resulted from the police insistence that appellant contact his parents. Most significant is the fact that counsel was present and was available to detect and describe even the most subtle coercive or suggestive influences if they in fact had existed. No such testimony was offered. The significance of the presence of counsel during custodial interrogation was referred to at several places in

1. Implicit in the dissent of Mr. Justice ROBERTS is the assumption that the purpose of the Fifth and Sixth Amendment rights is to prevent a suspect from making incriminatory statements. This is not, nor has it ever been the purpose as determined by the United States Supreme Court of these protections. The constitutional protections assure that a suspect of crime will not be compelled against his will to incriminate himself. The constitutional safeguards were never intended to prevent him from doing so if the election was the product of his free will with a full appreciation of the consequences of his actions.

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966).

the opinion of the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966):

> That counsel is present when statements are taken from an individual during interrogation obviously enhances the integrity of the fact-finding processes in court. The presence of an attorney, and the warnings delivered to the individual, enable the defendant under otherwise compelling circumstances to tell his story without fear, effectively, and in a way that eliminates the evils in the interrogation process.

*Id.* at 466, 86 S.Ct. at 1624.

At another point of the decision, the United States Supreme Court observed:

> [The presence of counsel at the interrogation may serve several significant subsidiary functions as well. If the accused decides to talk to his interrogators, the assistance of counsel can mitigate the dangers of untrustworthiness. With a lawyer present the likelihood that the police will practice coercion is reduced, and if coercion is nevertheless exercised the lawyer can testify to it in court. The presence of a lawyer can also help to guarantee that the accused gives a fully accurate statement to the police and that the statement is rightly reported by the prosecution at trial.]

*Id.* at 470, 86 S.Ct. at 1626 (citation omitted).

We therefore conclude that the statement elicited during the June 13th counseled interview was knowingly made and free of any coercive influence.

## II. "THE FRUIT OF THE POISONOUS TREE"

In view of our finding that the June 13th statement was free of any illegal or coercive influences affecting its admissibility at trial, the only conceivable taint to the statement must have occurred as a result of prior police

contact with the appellant.[2] *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In discussing the "fruit of the poisonous tree" concept, the United States Supreme Court has specifically limited the extent to which prior illegal police conduct must be considered responsible for the securing of incriminatory information.

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

*Id.* at 487–88, 83 S.Ct. at 417 (footnote omitted) (citations omitted)

The issue in this case then is whether a counseled interrogation, preceded by an adequate opportunity to confer with counsel, is the kind of attenuating circumstances which would dissipate any prior illegality and "purge the primary taint." [3]

■■ Before answering this question, it is crucial to understand how the United States Supreme Court has perceived the role of counsel in the protection of the constitutional rights of our citizens. The thrust of the majority of landmark cases in this area is the requirement that devices be created to assure the presence of counsel at critical stages in the criminal proceedings, or to as-

---

2. At trial the Commonwealth confined proof of its case to information obtained from the June 13th signed statement and *not* from any of the prior statements which appellant has challenged here.

3. For purposes of a resolution of this appeal we will assume, without deciding, that there was a possibility of police misconduct. We note, however, that the record would indicate to the contrary.

sure that the defendant, *at least,* understands his right to have counsel present, if he so chooses. *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) ; *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) ; *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) ; *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The common premise upon which all of these decisions are based is the belief that the presence of counsel is the most effective means of protecting the rights of one accused of crime.[4] As we have pointed out earlier, the role of counsel is that of a bulwark between his client and the hostile atmosphere of police interrogation. In discussing its decision in *Escobedo v. Illinois, supra,* and the function of counsel in securing Fifth Amendment privileges, the United States Supreme Court stated :

The denial of the defendant's request for his attorney thus undermined his ability to exercise the privilege— to remain silent if he chose or to speak without any intimidation, bla⁺ant or subtle. *The presence of counsel, in all the cases before us today, would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege. His presence would insure that statements made in the government-established atmosphere are not the product of compulsion.*

*Miranda v. Arizona, supra,* 384 U.S. at 466, 86 S.Ct. at 1623 (emphasis added)

■ In view of the express language of *Miranda,* denominating counsel "an adequate protective device" the

4. In the event that counsel fails to fulfill his role the appropriate redress can be obtained through a claim of ineffective assistance of counsel. Post-Conviction Hearing Act, Act of January 25, 1966, P.L. 1580, § 3, 19 P.S. § 1180–3(c)(6); *Commonwealth v. Laboy,* 460 Pa. 466, 333 A.2d 868 (1975); *Commonwealth v. Dancer,* 460 Pa. 95, 331 A.2d 435 (1975); *Commonwealth v. Hosack,* 459 Pa. 27, 326 A.2d 352 (1974); *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967).

concept of attenuation and dissipation of prior taint enunciated in *Wong Sun, supra,* if it has any application at all, must certainly be satisfied when a confession is made in the presence of, and under the direction of, counsel.

This Court has recently considered the effect of counsel as an insulating factor from prior police misconduct. In *Commonwealth v. Cockfield, supra,* the defendant had been taken into custody at 1:00 A.M. and was questioned intermittently until 12:05 A.M. on the succeeding day. During all of that time, appellant was without benefit of counsel. It was not until after the statement had been reduced to writing and he was in the process of signing it that counsel, retained by his family, first arrived. After a brief discussion, during which the attorney was made aware of the charges, counsel advised his client to continue signing the statement. This Court reasoned that, regardless of what police improprieties may have preceded counsel's arrival, the act of signing by appellant after the instruction was given by counsel, was a result of counsel's advice and not the product of any suggestion or coercion which may have occurred prior thereto.

It may very well be that had the appellant not conferred with counsel his confession would be considered involuntary under the totality of the circumstances test. The appellant, however, after conferring with counsel who had an opportunity to read the confession, reaffirmed, on the advice of counsel, his willingness to make the statement by signing the statement in the presence of counsel. Psychologically coercive influences may have affected the appellant prior to his consultation with counsel, but it cannot be said that the signing of the statement after consultation with counsel was a product of those factors. Counsel had not been subjected to those factors and after being informed of the statement advised his client to sign the statement. Appellant was obviously following the ad-

vice of counsel. Had counsel advised otherwise any statement made or signed by the appellant prior to the appearance of counsel would present an entirely different question. Under these circumstances however, we cannot conclude that the prosecution failed to meet its burden of proving the voluntariness of the confession by a preponderance of the evidence. *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A.2d 426 (1968). *Id.* 465 Pa. at 419, 350 A.2d at 835.[5]

The facts presented in this appeal provide an even more compelling basis for adopting the *Cockfield* rationale. Even, as we have heretofore so indicated, assuming that there was some coercion exercised prior to the counseled interrogation of June 13th this appellant, unlike *Cockfield,* had an unhurried opportunity to confer with counsel prior to the interrogation in a location separate and apart from police officials. Further, the incriminatory statements resulting during the interview were elicited under circumstances which we have already found to be devoid of any type of coercive influence.

■ Under these circumstances we find that the counseled interrogation, preceded by ample opportunity to confer, was an occurrence, as a matter of law, so attenuated any prior illegalities that any taint was sufficiently purged.

### III. THE COURT'S RULING ON THE ADMISSIBILITY OF THE EVIDENCE RELATING TO THE POLYGRAPH

In a somewhat related argument, appellant contends that the trial judge erred in prohibiting defendant from

5. We are at a complete loss to understand Mr. Justice ROBERTS' analysis of our decision in *Cockfield.* The suggestion that *Cockfield* should be read as providing that an accused who has been offered the opportunity to confer with counsel *before* confessing to a crime, is but a factor in the legal determination of the admissibility of the statement is, in our judgment, completely irreconcilable with the facts and the language of that opinion.

introducing testimony concerning the use of the polygraph examination on June 7, 1973. Appellant argues that he proffered evidence at trial which would have established that the inculpatory statement was, in fact, coerced. It is asserted that the police deliberately misrepresented to appellant that he failed to pass the polygraph examination and that the results thereof indicated that he was the murderer or was, at least, present at the scene of the crime. It is argued that this misrepresentation caused the first admission of guilt. It is also suggested that since the warnings accompanying the polygraph indicated that the results could not and would not be used against him, this was inconsistent with the Miranda warnings that anything he said would be used against him, and thus confused appellant as to his rights.[6]

The United States Supreme Court in *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1968), announced that the United States Constitution requires a judicial determination, *out of the hearing of a jury,* of the admissibility at trial of an incriminatory statement. The purpose of the principle announced in *Jackson, supra,* was to prevent the jury from being advised of the existence of admissions or confessions before their voluntariness had first been judicially ascertained. The due process clause does *not* require, however, that a jury *also* pass on the question of voluntariness. Nonetheless, several jurisdictions, including Pennsylvania, have adopted the Massachusetts or "humane rule," which

---

**6.** The latter portion of the argument goes to the effectiveness of the waiver, hence its admissibility, which is unquestionably a matter that must be determined by the court and is distinguishable from the first part of this argument which relates to the voluntariness of the statement which *may,* under the proper circumstances, also be presented to the trier of fact. *Commonwealth v. Johnson,* 467 Pa. 146, 354 A.2d 886 (1976); *Commonwealth v. Green,* 464 Pa. 557, 347 A.2d 682 (1975); *Commonwealth v. Camm,* 443 Pa. 253, 277 A.2d 325 (1971); cert. denied, 405 U.S. 1046, 92 S.Ct. 1320, 31 L.Ed.2d 589 (1972); *see also* Rule 323(j) of the Pennsylvania Rules of Criminal Procedure.

permits the defendant a second opportunity to test the voluntariness of his statement. Under this approach, the defendant is permitted to introduce evidence at trial relating to the voluntariness of a challenged statement. When a jury is so confronted it may not assess the evidentiary weight to be given to the evidence until it first makes an independent finding that the confession was voluntarily made. *Commonwealth v. Johnson,* 467 Pa. 146, 354 A.2d 886 (1976); *Commonwealth v. Green,* 464 Pa. 557, 347 A.2d 682 (1975); *Commonwealth v. Camm,* 443 Pa. 253, 277 A.2d 325 (1971); *cert. denied,* 405 U.S. 1046, 92 S.Ct. 1320, 31 L.Ed.2d 589 (1972); *see also* Rule 323(j) of the Pennsylvania Rules of Criminal Procedure.

> The rights of a defendant in this area are, in our opinion, adequately protected by Rule 323 of the Pennsylvania Rules of Criminal Procedure, 19 P.S. (1975 Pamphlet), relating to the suppression of evidence. That rule is modelled after the so-called Massachusetts or "humane" rule approved by the Supreme Court of the United States in *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). It provides that prior to trial, upon motion of the defendant to suppress evidence allegedly obtained unconstitutionally, a hearing shall be held to determine the admissibility of the challenged evidence. If the evidence is found to be admissible, the defendant is foreclosed only from challenging its admissibility at trial; he may still contest the validity of such evidence notwithstanding its admission.

*Commonwealth v. Green, supra* 464 Pa. at 561, 347 A.2d at 684.

 This practice, however, is exercised under the supervisory power of this Court and is circumscribed by, among other things, the normal rules of evidence. Merely because we permit a jury to also consider the question of voluntariness does not mean that the jury

may usurp the traditional functions of the court in deciding evidentiary questions that might arise in relation to a given issue. The issue of relevance of proffered testimony is the responsibility of the court to resolve. The question of attenuation, within the *Wong Sun, supra,* definition necessarily involves a determination of whether preceding events are relevant to the issue of voluntariness of a particular statement. If a court finds, as a matter of law, that a confession has been obtained by means sufficient to dissipate the prior taint and under circumstances adequately removed and distinguishable from the prior illegality, this is tantamount to a determination that the preceding events are not relevant. While the circumstances surrounding the polygraph examination might be relevant to the voluntariness of the statement of June 7, they would not be relevant to the voluntariness of the instantly challenged statement in view of our ruling that the counseled interview served as an attenuating occurrence. The very concept of attenuation necessitates the conclusion that preceding events are legally unrelated. Because we believe that the counseled confession of June 13, as a matter of law, was purged of any prior illegality, evidence relating to allegedly coercive influences surrounding the involuntary statement of June 7 is irrelevant. The trial court, therefore, was correct in excluding the proffered testimony.[7]

Judgment of sentence affirmed.

MANDERINO, J., took no part in the consideration or decision of this case.

ROBERTS, J., filed a dissenting opinion.

---

7. Although the trial court did not base the exclusion of this evidence on the factors of legal attenuation and relevancy, we have often held that we may affirm the holding of a lower court if an alternative ground exists. *Commonwealth v. Shoatz,* 469 Pa. 545, 565–566, 366 A.2d 1216, 1226 (1976); *Commonwealth v. Dancer,* 460 Pa. 95, 101 n. 5, 331 A.2d 435, 438 n. 5 (1976); *Gilbert v. Korvette, Inc.,* 457 Pa. 602, 604, 327 A.2d 94, 96 (1974).

ROBERTS, Justice, dissenting.

In this appeal, appellant makes the following contentions:

(1) his confession of June 13, 1973, should have been suppressed because (a) it was tainted by improper police questioning on May 24 and June 7, 1973; and (b) it was involuntary;

(2) he should have been permitted to introduce evidence at trial concerning the use of a polygraph examination as a coercive tool used to secure the confession.

The majority dismisses appellant's first contention because appellant met with counsel before the June 13 confession was taken. I cannot agree with the majority's suggestion that the presence of counsel necessarily renders a confession voluntary and purges the confession from the taint of prior illegalities. Both claims are properly resolved only after an evaluation of the totality of the circumstances surrounding the confession. The majority unwisely departs from the fundamental principle that no single factor is determinative of these questions.

After reviewing the record, I would hold that the suppression court did not err when it denied appellant's motion to suppress because I find that his confession was voluntary in the totality of the circumstances and that no improper police conduct preceded the June 13 confession. I would not rely on the new, per se rule created by the majority today.

In my view, however, appellant's second contention is meritorious. Appellant is entitled to a new trial because the trial court erred in excluding evidence concerning the use of a polygraph examination on June 7 as a coercive factor which led to his June 13 confession. Evidence that a defendant was given a polygraph examination before confessing is relevant to the determination whether the confession was voluntary in the totality of the cir-

cumstances. Appellant was therefore entitled to introduce such evidence at trial.

The majority holds, however, that because appellant's conference with counsel dissipated the taint of any prior illegalities as a matter of law, coercive influences surrounding appellant's June 7 statement were irrelevant to the jury's determination of the voluntariness of the June 13 confession. I cannot agree that the determination that a second confession is free of the taint of prior illegalities affects the relevance of the events which preceded the confession when the voluntariness of the confession is at issue. The majority has confused two distinct doctrines which have different purposes and applications. Appellant's experience with a polygraph examination on June 7 was part of the totality of the circumstances which led to his later confession and was therefore relevant to the jury's consideration of the voluntariness of his subsequent confession. By its holding today, the majority has unjustifiably curtailed appellant's right to a jury determination of a crucial issue in the case.

I would reverse the judgment of sentence and grant a new trial.

I—The Facts.

On May 12, 1972, at approximately noon, Karen Dockray was found stabbed to death in the garage of her home. The police investigation eventually focused on Ronald Hoffman, a student at Susquehanna Township High School, located near the victim's home. On April 25, 1973, the police interviewed appellant, William Cunningham, another Susquehanna Township High School student. Appellant was known as one of Hoffman's acquaintances. The interview, which lasted about one hour, was conducted at the high school with the consent of appellant's parents and in the presence of an assistant principal. Appellant was not given *Miranda*[1] warnings

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

before the interview. During the interview, appellant stated that a few days after the homicide, Hoffman described some of the details of the crime to him. Although Hoffman did not admit to appellant that he committed the crime, appellant said he thought Hoffman was responsible.

On May 19 and May 20, 1973, appellant was questioned at his sister's house by a detective who was also a family friend. At the latter session, appellant stated that at 11:30 A.M., on the morning of the homicide, Hoffman told him that a woman had been killed.

On May 24, 1973, appellant was taken, with parental consent, to state police headquarters for questioning. Again, he was not given *Miranda* warnings. He related various details of the crime but maintained that everything he knew came from Hoffman. The police requested that appellant take a polygraph examination. After he initially refused, the police persuaded him to take the examination. The examination was scheduled for a later date.

On June 7, 1973, at approximately 9:00 A.M., appellant was taken, with parental consent, to the Susquehanna Township Municipal Building for the polygraph examination. Appellant was read his *Miranda* warnings and signed a waiver form.[2] He was also told that the polygraph test could not be used against him in court. During the pre-polygraph questioning, appellant repeated in substance his statements of May 24, 1973. He volunteered to lead the police on a search for evidence left by Hoffman near the scene of the crime. The search lasted from 11:30 A.M. to 2:30 P.M. After the search, he had lunch with the police officers and then returned to the Municipal Building for the polygraph examination.

2. The police stated that although appellant was not the focus of the investigation at that time, it was their procedure to advise an individual of his *Miranda* rights prior to the pre-polygraph interview.

Following the polygraph examination, the police told appellant that he was not being truthful. In response, appellant for the first time admitted complicity in the murder. He stated that he went to the victim's home with Hoffman as a lookout and saw Hoffman stab the victim. This admission was made between 4:00 P.M. and 5:00 P.M. The police unsuccessfully attempted to contact appellant's parents. Appellant had dinner and, at 8:20 P.M., after being advised of his rights by the district attorney, gave a formal statement. He was charged with burglary and incarcerated in the county prison. Ronald Hoffman was charged with murder the next day.

On June 13, 1973, appellant was taken from the county prison to the district attorney's office at about 2:00 P.M., to prepare him to testify at Hoffman's preliminary hearing. He was again advised of his constitutional rights. During the interrogation, appellant broke down and cried. He then confessed that he, not Ronald Hoffman, killed Karen Dockray. The district attorney again informed him of his rights and suggested that his parents be called. Appellant chose to complete his statement.

At 4:00 P.M., after the conclusion of this oral confession, appellant's parents were called and brought to the district attorney's office. They retained an attorney who arrived and conferred with appellant from 6:00 P.M. to 6:30 P.M. At 6:30 P.M., after he was again advised of his constitutional rights, appellant made a stenographically recorded statement in the presence of his counsel, in which he confessed to the murder of Karen Dockray. This last recorded statement was the only one introduced by the Commonwealth at trial.

When he confessed to this homicide, appellant was an 18 year old special education student. His I.Q. was 77, which placed him on the border line between normal and retarded. Appellant's expert witness, a psychiatrist, testified appellant had little capacity for exercising judgment in difficult situations. He concluded that appellant

neither understood his *Miranda* warnings nor confessed voluntarily. The Commonwealth's expert, on the other hand, testified that appellant's low I.Q. was due to a reading problem and that in terms of "street sense," appellant fell within the range of normal intelligence. He concluded that appellant knowingly and intelligently waived his rights and confessed voluntarily.

II—The Suppression Court Properly Denied Appellant's Motion to Suppress.

A. *Fruit of the Poisonous tree.*

Appellant claims that his statements on June 13, 1973, were tainted by prior improper questioning. He asserts that he was entitled to *Miranda* warnings before the interview of May 24, 1973, and that his waiver of his rights on June 7, 1973, was ineffective. However, the trial court's determination that the June 13 confession was not preceded by improper police interrogation is supported by the record. It is, therefore, unnecessary to reach the fruit of the poisonous tree issue.

1. The May 24, 1973 Questioning.

The police had no duty to inform appellant of his *Miranda* rights before the May 24, 1973 questioning. *Miranda* warnings must be given before any police questioning whenever an individual is in custody or is the focus of a police investigation. *Commonwealth v. D'Nicuola,* 448 Pa. 54, 292 A.2d 333 (1972); *Commonwealth v. Simala,* 434 Pa. 219, 252 A.2d 575 (1969). On May 24, 1973, appellant was not the focus of the police investigation in the murder of Karen Dockray; the focus of the investigation was clearly upon Ronald Hoffman. The purpose of the May 24 session was to obtain information relevant to the Hoffman investigation. Indeed, appellant's statements inculpated Hoffman and were not self-incriminatory. Nor was appellant in custody when he was questioned at the state police headquarters. Ap-

pellant consented to the questioning and the police first obtained the permission of his parents and school officials. The session lasted about one hour and appellant was then returned to school. The record suggests that appellant considered himself to be a witness freely assisting the police investigation. There is no indication that appellant was " 'led to believe, as a reasonable person, that he [was] being deprived or restricted of his freedom of action or movement under the pressures of official authority.' " *Commonwealth v. Marabel*, 445 Pa. 435, 441–42, 283 A.2d 285, 288 (1971), quoting *Myers v. State*, 3 Md.App. 534, 536, 240 A.2d 288, 290 (1968).

2. The June 7, 1973 Questioning.

The record supports the suppression court's determination that appellant knowingly and intelligently waived his rights before he was questioned on June 7, 1973.

The Commonwealth has the burden of proving by the preponderance of the evidence that appellant knowingly and intelligently waived his rights. *Commonwealth v. Romberger*, 464 Pa. 488, 347 A.2d 460 (1975); *Commonwealth v. Goodwin*, 460 Pa. 516, 333 A.2d 892 (1975); *Commonwealth v. Jones*, 459 Pa. 286, 328 A.2d 828 (1974); see Pa.R.Crim.P. 323(h). The suppression court ruled that the Commonwealth sustained its burden of proving that appellant knowingly and intelligently waived his rights. In reviewing the suppression court's determination, we consider only the prosecution's evidence and so much of the defense's evidence which, fairly read in the context, remains uncontradicted. *Commonwealth v. Goodwin*, supra; *Commonwealth v. Jones*, supra. If the suppression court's findings are supported by the record, they will not be disturbed on appeal. *Commonwealth v. Stafford*, 451 Pa. 95, 301 A.2d 600 (1973); *Commonwealth v. Sharpe*, 449 Pa. 35, 296 A.2d 519 (1972).

In determining whether a waiver of constitutional rights was knowing and intelligent, all the attending circumstances must be considered, including the age, maturity and intelligence of the individual involved. *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976); *Commonwealth v. Moses,* 446 Pa. 350, 287 A.2d 131 (1971); see *Commonwealth v. Cannon,* 453 Pa. 389, 309 A.2d 384 (1973); *Commonwealth v. Scoggins,* 451 Pa. 472, 304 A.2d 102 (1973). Although appellant was described as on the border line between normal and retarded, the testimony of the interrogating officers and the Commonwealth's psychiatrist and a review of the transcripts of his statements support the trial court's determination that appellant knowingly and intelligently waived his rights.

B. *Voluntariness.*

Appellant asserts that even if the June 13, 1973, confession was not tainted by improper police conduct, it was involuntarily given.

The Commonwealth has the burden of proving that a confession was voluntary. *Commonwealth v. Jones,* 457 Pa. 423, 322 A.2d 119 (1974); *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A.2d 426 (1968); see Pa.R.Crim.P. 323(h). In reviewing the suppression court's finding that the confession was voluntary, we again consider only the prosecution's evidence and so much of the defense's evidence which, fairly read in the context, remains uncontradicted. *Commonwealth v. Crosby,* 464 Pa. 337, 346 A.2d 768 (1975); *Commonwealth v. Tucker,* 461 Pa. 191, 335 A.2d 704 (1975); *Commonwealth v. Jackson,* 457 Pa. 237, 324 A.2d 350 (1974). If the suppression court's findings are supported by the record, they will not be disturbed on appeal. *Commonwealth v. Crosby,* supra; *Commonwealth v. Jackson,* supra.

The test of voluntariness is whether

"the confession [was] the product of an essentially free and unconstrained choice by its maker. If . . . he has willed to confess, it may be used against him. If . . . his will has been overborne and his capacity for self-determination critically impaired, the use of the confession offends due process."

*Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (opinion of Frankfurter, J., joined by Stewart, J.). E. g., *Commonwealth v. Jones,* 457 Pa. 423, 322 A.2d 119 (1974); *Commonwealth v. Alston,* 456 Pa. 128, 317 A.2d 241 (1974); *Commonwealth v. Hallowell,* 444 Pa. 221, 282 A.2d 327 (1971); *Commonwealth ex rel. Butler v. Rundle,* supra. In determining whether a confession was voluntarily rendered, we consider the totality of the circumstances. E. g., *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (opinion of Stewart, J.); *Culombe v. Connecticut,* supra (opinion of Frankfurter, J., joined by Stewart, J.); *Commonwealth v. Alston,* supra; *Commonwealth v. Hallowell,* supra. The characteristics of the accused as well as the details of the interrogation are relevant to the inquiry. More specifically, in assessing the totality of the circumstances we consider the age of the accused; his education level; his intelligence; his physical state; the duration and methods of interrogation; the conditions of detention; the advice given as to his constitutional rights; and any other conditions which may affect one's powers of resistance to suggestion and undermine one's self-determination. Compare *Schneckloth v. Bustamonte,* supra (opinion of Stewart, J.) with *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976); *Commonwealth v. Alston,* supra.

Here, it is undisputed that appellant was neither physically mistreated nor continuously interrogated. On June 7, 1973, appellant arrived at the Municipal Building

to take the polygraph examination at 9:00 A.M. He was interrogated for about an hour and a half. He then led the police on the search for evidence near the victim's home, during which time no interrogation took place. Appellant lunched with the police in a public restaurant before returning to the Municipal Building for the polygraph examination. Appellant incriminated himself in the subsequent period of questioning which lasted from about 3:30 to 4:30 P.M. He was not interrogated again for about four hours. During that interval, he was in the company of an adult friend and dined in a public restaurant. From 8:30 to 9:40 P.M., he gave a stenographically recorded statement to the police. Thus, appellant was interrogated for less than four hours on June 7 and had the opportunity to rest and refresh himself between sessions.

Appellant contends that despite the lack of physical mistreatment, the interrogations on June 7 and June 13 were psychologically coercive. This argument is based upon appellant's low I.Q., the length of time he was subject to police supervision (if not interrogation) and the use of the polygraph examination in the interrogation process. As Mr. Justice Nix stated for the majority in *Commonwealth v. Alston,* 456 Pa. at 134, 317 A.2d at 244 (1974):

"[W]hen the question of voluntariness passes beyond the realm of physical coercion and into degrees of psychological coercion, most careful attention will be afforded to any facts, circumstances or events tending to overbear the will of the accused."

Accord, *Commonwealth v. Kichline,* 468 Pa. 265, 361 A. 2d 282 (1976); *Commonwealth v. Simms,* 455 Pa. 599, 317 A.2d 265 (1974).

A review of the record shows that appellant's confession was voluntary. His statements to the police were entirely exculpatory until after he took the polygraph

examination.[3] He was treated as and appeared to relish his status as a cooperating witness. After the polygraph examination, the police told him that they thought he had not been entirely truthful. Although the interrogation intensified at that point, I do not believe appellant's free will was overborne.

This conclusion is buttressed by our decision in *Commonwealth v. Cockfield,* 465 Pa. 415, 350 A.2d 833 (1976). Before appellant made his statement to the police on the evening of June 13, he conferred with his attorney. In *Cockfield,* we held that the opportunity to confer with counsel is a factor which, in the totality of the circumstances, militates toward a finding of voluntariness. The record indicates that appellant had the opportunity to confer privately with counsel, who fully advised him of his rights. Moreover, before meeting with appellant, counsel was informed by the police of the circumstances in which appellant confessed and their prior investigation. Appellant's discussion with counsel, considered with all the circumstances surrounding the confession, supports the conclusion that it was voluntarily given.

C. *The Majority Misinterprets Miranda v. Arizona and Commonwealth v. Cockfield.*

The majority suggests that under the rationale of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the presence of counsel on June 13, 1973, is determinative of appellant's claim that his confession should have been suppressed because it was involuntary. This reliance on *Miranda* is misplaced.

3. The use of a polygraph examination in the interrogation process, standing alone, does not render a confession involuntary. *Commonwealth v. Jones,* 341 Pa. 541, 19 A.2d 389 (1941); *Commonwealth v. Hipple,* 333 Pa. 33, 3 A.2d 353 (1939). Nevertheless, its use may be considered as part of the totality of the circumstances when determining the voluntariness of the confession. Part III, infra.

The passages quoted by the majority discuss why the presence of counsel may overcome police practices which effectively undermine the free will of a suspect who is in custody. In *Miranda,* the Court did not consider the effect of counsel's presence upon the mental state of an individual who may already have been subjected to the debilitating effects of psychologically coercive police interrogation techniques. See generally id. at 448–55, 86 S.Ct. at 1614–18. I cannot agree that within moments of the arrival of an attorney, with whom the accused may have never met before, the impact of all that has previously occurred behind closed police doors magically evaporates. If, for example, an accused has been subjected to prolonged in-custody interrogation, his opportunity to briefly confer with counsel will not necessarily erase all that preceded the attorney's arrival on the scene. The world of in-custody police interrogation is not so simple as the majority would have it.

Indeed, in *Miranda* itself, the Supreme Court implicitly recognized that the mere presence of counsel does not necessarily dissipate the inherently compelling pressures accompanying in-custody interrogation. In discussing the requirement that interrogation must cease if the accused indicates in any manner that he wishes to remain silent, the Court observed:

> "If an individual indicates his desire to remain silent, but has an attorney present, there may be some circumstances in which further questioning would be permissible. In the absence of evidence of overbearing, *statements then made in the presence of counsel might be free of the compelling influence of the interrogation process* and might be fairly construed as a waiver of the privilege for purposes of these statements."

Id. at 474 n. 44, 86 S.Ct. at 1627–28 n. 44 (emphasis added).

Nor can I agree that the mere opportunity to confer with counsel shortly before a confession is taken from a suspect purges the taint of prior illegalities as a matter of law. If the prior interrogations had been improper, our inquiry would be whether the June 13, 1973, confession "was obtained under circumstances sufficiently distinguishing to purge it of the original taint." *Commonwealth v. Banks*, 429 Pa. 53, 59, 239 A.2d 416, 419 (1968); *Commonwealth v. Brown*, 213 Pa.Super. 288, 296, 247 A.2d 802, 805 (1968). In making this determination, we analyze the totality of the circumstances. *Commonwealth v. Marabel*, 445 Pa. 435, 283 A.2d 285 (1971). See generally *Commonwealth v. Mitchell*, 445 Pa. 461, 285 A.2d 93 (1971); *Commonwealth v. Ware*, 438 Pa. 517, 265 A.2d 790 (1970); *Commonwealth v. Banks*, supra; *Commonwealth v. Brown*, supra.

However, the confession here was not preceded by improper police interrogation. Therefore, it is not necessary to reach the "fruit of the poisonous tree" issue. The majority, without deciding whether the questioning on May 24 and June 7, 1973 were improper, relies on *Commonwealth v. Cockfield*, 465 Pa. 415, 350 A.2d 833 (1976), to dismiss appellant's contentions.

In *Cockfield*, we found that an accused's opportunity to confer with counsel before signing a written confession rendered the confession voluntary in the totality of the circumstances. *Cockfield* stands only for the proposition that conferring with counsel shortly before incriminating oneself lends support to a finding that the admissions were voluntarily made.

*Cockfield* involved a determination whether a confession was voluntary, not whether it was tainted by prior illegalities. Nevertheless, since both inquiries examine the totality of the circumstances, I believe that the opportunity to confer with counsel is also relevant to the determination whether a confession was obtained in a fashion sufficient to purge it from the prior taint. But I

must reject the majority's conclusion that the presence of counsel is determinative of the issue.

Accordingly, while I agree that the suppression court properly denied appellant's motion to suppress, I am unable to accept the majority's analysis of this question.

### III—The Polygraph Evidence was Improperly Excluded at Trial.

Appellant's last contention is that he was entitled to introduce evidence concerning the use of a polygraph examination during the interrogation of June 7, 1973. Appellant claims that use of the polygraph examination was a coercive influence which led to his first confession on June 7, and that the evidence therefore was relevant to the jury's determination whether his later confession was involuntary in the totality of the circumstances.[4] I believe the trial court erred in excluding this testimony offered by the defense.

The general rule in Pennsylvania is that a reference to a polygraph examination or the results thereof which may raise an inference concerning the guilt or innocence of a defendant is inadmissible. *Commonwealth v. Camm*, 443 Pa. 253, 277 A.2d 325 (1971), cert. denied, 405 U.S. 1046, 92 S.Ct. 1320, 31 L.Ed.2d 589 (1972). Polygraph examinations have not attained acceptance as a reliable means of ascertaining truth or deception. See *Commonwealth v. Brooks*, 454 Pa. 75, 309 A.2d 732 (1973) (opinion of O'Brien, J., joined by Pomeroy, J.); *Commonwealth ex rel. Riccio v. Dilworth*, 179 Pa.Super. 64, 115 A.2d 865 (1955); J. McCormick, Evidence § 208 (2d ed. 1972). Thus, the Commonwealth may not reha-

---

4. In Pennsylvania, even if the suppression court determines a confession is voluntary and therefore admissible, a defendant has the right to contest voluntariness before the jury. Like a suppression court, the jury decides whether a confession is voluntary on the basis of the totality of the circumstances. Here, the defense's theory was that in light of the coercion on June 7, as well as other circumstances, appellant's confession on June 13 was also involuntary.

bilitate a witness who was impeached by a prior inconsistent statement by introducing evidence that the witness took a polygraph examination which led to the later statement. *Commonwealth v. Johnson,* 441 Pa. 237, 272 A.2d 467 (1971). Nor may a defendant introduce the results of a polygraph examination, *Commonwealth v. Brooks,* supra (opinion of O'Brien, J., joined by Pomeroy, J.); see *Commonwealth v. Talley,* 456 Pa. 574, 318 A.2d 922 (1974) (opinion of O'Brien, J.), or evidence that he was willing to take a polygraph examination, *Commonwealth v. Saunders,* 386 Pa. 149, 125 A.2d 442 (1956).

Appellant emphasizes that he did not attempt to introduce evidence that he had taken a polygraph examination in order to prove the truth or falsity of his admissions. In this respect, appellant's offer differed from those in prior cases which prohibited a defendant from introducing polygraph evidence. Appellant's purpose was to show that the use of the examination contributed to the coercive atmosphere which led to his involuntary admissions.

The issue, then, is one not previously addressed in Pennsylvania: whether a defendant may introduce evidence that he took a polygraph examination in order to prove to the jury that his confession was involuntary.[5]

---

5. In *Commonwealth v. Camm,* 443 Pa. 253, 277 A.2d 325 (1971), cert. denied, 405 U.S. 1046, 92 S.Ct. 1320, 31 L.Ed.2d 589 (1972), Detective Krimmel, a prosecution witness, testified that the defendant had taken a polygraph test. The testimony was elicited to prove that the defendant's confession was voluntary. He did not testify as to the results of the test. On cross-examination, the witness was asked what occurred during the period after the examination and before the confession. He replied that Detective Kowalczyk told the defendant "he was lying and needed a lawyer." Id. at 270, 277 A.2d at 334. Later in the trial, Detective Kowalczyk testified to the same effect. On appeal, the defendant contended that it was prejudicial error to admit Detective Kowalczyk's testimony concerning the polygraph examination. We held that since the inference of an unfavorable test result was first brought out by defendant's cross-examination, admitting the later testimony was not prejudical error. An examination of our holding might suggest that Detective Krimmel's original testimony, in

In other jurisdictions, this question has arisen when the prosecution has introduced evidence that the defendant took a polygraph examination in order to show that a subsequent confession was voluntary. In that posture, the courts have had to decide not only whether taking the examination bears on voluntariness, but also whether admitting the evidence prejudices the defendant by indirectly permitting the jury to consider the results of the examination.

In *Tyler v. United States,* 90 U.S.App.D.C. 2, 193 F.2d 23 (1951), the United States Court of Appeals for the District of Columbia held that prosecution evidence that the defendant had taken a polygraph examination and was told afterward that he had lied was admissible to prove the voluntariness of the subsequent confession where the trial court instructed the jury that the evidence was to be considered only on the question of voluntariness and not as evidence that the defendant had actually lied.

> "The evidence had a material bearing upon the conditions leading to Tyler's confession and was relevant upon the vital question as to whether the same was voluntary. With the court's clear and positive instruction to the jury, holding the evidence within proper bounds . . . we are not warranted in assuming that any prejudicial results followed . . . ."
> 193 F.2d at 31.

Other courts have concluded that evidence that a polygraph test was administered is not admissible if the evidence raises an inference as to the test results. This implies that cautionary instructions are not sufficient to protect the defendant from prejudice. See *Johnson v.*

which he stated that defendant had taken a polygraph test without referring to the results of the test, was not prejudicial. However, it does not appear that the defendant challenged the admissibility of Detective Krimmel's testimony. Thus, *Camm* did not resolve whether evidence that an accused took a polygraph test before confessing is admissible on the question of voluntariness.

*State,* 166 So.2d 798 (Fla.App.1964) ; *Leeks v. State,* 95 Okl.Crim. 326, 245 P.2d 764 (1952). Even so, the relevance of the examination process to the voluntariness inquiry is not questioned. See *Johnson v. State,* supra; *Leeks v. State,* supra. See also *People v. McHenry,* 204 Cal.App.2d 764, 22 Cal.Rptr. 621 (1962) ; *People v. Wilson,* 78 Misc.2d 468, 354 N.Y.S.2d 296 (Cty.Ct.1974). In *Johnson v. State,* supra, the court reasoned:

> "It is well established that the mere fact that a lie detector examination may have been involved in procuring a confession does not render the confession inadmissible. . . . However, if the defendant is forced to submit to the examination or if the methods of examination are such as to constitute actual or psychological coercion the resulting confession may well be found involuntary. . . .
>
> "Necessarily, when a confession procured during or as a result of a lie detector examination is challenged, the facts surrounding the confession will be disclosed. . . . [T]hese same facts—including the fact that the defendant was subjected to a lie detector—may be disclosed to the jury . . . ."

Id. 166 So.2d at 802–03.

In *State v. Green,* 271 Or. 153, 531 P.2d 245 (1975), the Oregon Supreme Court took the position that neither evidence that a polygraph examination was taken, the details of the examination, nor its results may be offered by the prosecution to lay the foundation for the admission of a confession. The court reasoned that the danger of prejudice to the defendant outweighed its probative value:

> "[E]vidence of the results of polygraph tests is not admissible as substantive evidence to prove that a person has lied or told the truth. Nevertheless, the jury is likely to infer from evidence of the fact that a criminal defendant was the subject of a polygraph test before making a confession that he lied in response to ques-

tions asked during a polygraph test and that he confessed because he was caught lying by the polygraph. As a result, there is danger that such evidence may unduly prejudice the jury . . . ."

531 P.2d at 252–53. The court also held that if a defendant objects to admission of the confession on the ground that it was involuntary, arguing that the polygraph examination was a coercive influence, the prosecution may rebut this contention by introducing evidence concerning the details of the examination, including its results, if relevant to the determination of voluntariness.

Here, however, it is unnecessary to decide whether the Commonwealth may ever introduce evidence that a defendant took a polygraph examination. We need only decide whether a defendant is entitled to introduce such evidence to aid the jury in passing on the voluntariness of his confession.

The taking of a polygraph examination is part of the totality of the circumstances in which a confession is obtained and, as the cases discussed above uniformly recognize, is therefore relevant to determining voluntariness. The only reason to exclude such evidence is the danger of prejudice to the defendant. Where the defendant seeks to admit such evidence, the rationale for exclusion disappears. Unlike the cases in which prosecution seeks to introduce evidence of a polygraph examination, the only question here is the relevance of the evidence. Appellant obviously concluded that the value of evidence that he took a polygraph examination to his claim that his confession was coerced outweighed the danger of prejudice. This is a tactical decision that is properly left to the defendant. Since the evidence appellant offered was relevant, it should not have been excluded by the trial court.

In a recent decision, the Maryland Court of Special Appeals reached the same conclusion. In *Johnson v. State,* 31 Md.App. 303, 355 A.2d 504 (1976), the court reversed a conviction because the trial court excluded

from the jury's consideration of voluntariness evidence that a polygraph examination was used in obtaining the defendant's confession. The court reasoned that

"[i]t would be unsound to exclude from the jury's consideration of voluntariness the psychological effect of the use of polygraph devices when we fail to exclude the effect of any other potential coercive condition, person or device present during interrogation."

31 Md.App. at 308, 355 A.2d at 508.

The majority refuses to reach appellant's claim, asserting that because "the counseled confession of June 13, as a matter of law, was purged of any prior illegality, evidence relating to allegedly coercive influences surrounding the involuntary statement of June 7 is irrelevant." I cannot agree.

A defendant has a constitutional right to a fair hearing and reliable determination at some stage of the proceedings on the voluntariness of his confession. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). In Pennsylvania, we follow the "Massachusetts" or "humane" rule, which requires submission of the issue of voluntariness to the jury even though a suppression court has found a confession voluntary. *Commonwealth v. Joyner*, 441 Pa. 242, 272 A.2d 454 (1971); Pa.R. Crim.P. 323(j). As the Superior Court stated in *Commonwealth v. McLean*, 213 Pa.Super. 297, 304, 247 A.2d 640, 644 (1968):

"The determination of voluntariness usually involves issues of fact which traditionally belong to the jury. . . . [R]equiring the jury to pass on the issue of voluntariness . . . preserves to the defendant his right to a jury trial on this critical issue. Pa.Const. art. I, § 9. . . . [To leave] to the jury only the question of weight and credibility, would in our opinion deprive the defendant of a jury trial on one of the most fundamental questions of the case—voluntariness of his self-incrimination."

It follows that a defendant has the right to place before the jury all evidence that is relevant to the determination of voluntariness.

In my view, appellant offered a cognizable theory of involuntariness and should have been permitted to submit his evidence to the jury. Just because a suppression court has determined that prior illegalities have been purged, a defendant is not precluded from introducing evidence of those prior events at trial to prove to the jury that his subsequent confession was involuntary.

Here, it was within the jury's province to find that the atmosphere was so coercive on June 7 and June 13, 1973, that appellant's admissions were involuntary, notwithstanding the later presence and advice of counsel. The presence of counsel on June 13 did not render evidence concerning the June 7 interrogation irrelevant; appellant has the right to introduce evidence bearing upon the atmosphere and events which led to his confession.[6]

The majority reasons that since the presence of counsel on June 13 purged appellant's confession of the taint of any prior illegalities as a matter of law, it also rendered all preceding events irrelevant for purposes of determining the voluntariness of his statements. This position has no foundation in law, logic or reason.

First, the presence of counsel does not, as a matter of law, render a confession voluntary or purge the taint of prior illegalities. Part II C, supra. Until the majority's inexplicable departure from precedent, these determinations have always been based upon an evaluation of the totality of the circumstances.

6. Appellant states that his polygraph expert would testify that the police lied when they suggested that the polygraph machine indicated that appellant had not been truthful. This, too, is relevant to the voluntariness inquiry. Deception concerning the results of the polygraph test would indicate that there was a strenuous effort to induce a confession. Thus, it lends support to the defense theory that the atmosphere and interrogation were psychologically coercive.

Moreover, there is no basis for the majority's conclusion that once a second confession is determined to be free of the taint of prior illegalities, prior interrogations are irrelevant in determining the voluntariness of the second confession. Attenuation and the relevance of evidence bearing on voluntariness are unrelated concepts. In our system of justice, involuntary confessions are disregarded for reasons that are distinct from the reasons that evidence obtained through the exploitation of improper police conduct is suppressed. Moreover, the process by which the two determinations are made differ significantly.

The "fruit of the poisonous tree" doctrine "is a response to the realization that if police officers are permitted to use knowledge gained from unlawfully obtained evidence to obtain the same or other valuable evidence legally, an inducement to commit such unlawful practices continues to exist." Comment, Fruit of the Poisonous Tree—A Plea for Relevant Criteria, 115 U.Pa.L.Rev. 1136, 1138 (1967). Thus, the "fruit of the poisonous tree" doctrine involves a balancing of the benefits accruing to society from deterring unlawful police practices against the detriments from the suppression of probative evidence.

The exclusion of confessions obtained against the will of the accused, on the other hand, involves far more than the "deep-rooted feeling that the police must obey the law while enforcing the law." *Spano v. New York*, 360 U.S. 315, 320, 79 S.Ct. 1202, 1205–06, 3 L.Ed.2d 1265 (1959). A confession obtained from an accused who has been drained of his capacity for freedom of choice may itself be unreliable—the very contention appellant made at trial. Moreover, regardless whether the statements obtained may be independently established as true, the fifth amendment privilege against self-incrimination is a constitutional mandate that a confession elicited against the will of the accused be disregarded.

"[T]he constitutional foundation underlying the privilege is the respect a government . . . must accord to the dignity and integrity of its citizens. . . . [O]ur accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth."

*Miranda v. Arizona,* 384 U.S. at 460, 86 S.Ct. at 1620; accord, *Blackburn v. Alabama,* 361 U.S. 199, 206–07, 80 S.Ct. 274, 279–80, 4 L.Ed.2d 242 (1960). See also *Jackson v. Denno,* 378 U.S. at 381–83, 84 S.Ct. at 1783–84.

The ultimate test of voluntariness is whether "the confession [was] the product of an essentially free and unconstrained choice by its maker." *Columbe v. Connecticut,* 367 U.S. at 602, 81 S.Ct. at 1879 (opinion of Frankfurter, J.). A determination of voluntariness requires an inquiry into both the "crude historical facts . . . and events surrounding the confession," and "how the accused reacted" to his experience. Id. at 603–04, 81 S. Ct. at 1879–80.

The determination of the voluntariness of a confession is, therefore, unlike the balancing process a court undertakes in deciding whether to suppress evidence as the "fruit of a poisonous tree." The latter inquiry cannot be compared to the often sensitive analysis of an accused's mental state which must be made when he asserts that his free will was overborne.

Thus, the majority errs when it asserts that the "question of attenuation . . . necessarily involves a determination of whether preceding events are relevant to the issue of voluntariness." The two concepts simply are not comparable. Therefore, evidence of an accused's experience during police interrogation may be relevant to a determination of the voluntariness of a subsequent confession whether or not a court concludes that prior illegalities have been purged.

Here, appellant offered evidence of a polygraph examination which he took on June 7. Since the June 7 interrogation was part of the totality of the circumstances which led to his confession on June 13, the evidence was relevant to a determination of the voluntariness of the June 13 statement and should not have been excluded by the trial court.

The majority's holding today impermissibly limits appellant's right to a jury trial. At the suppression hearing, the court heard evidence concerning the use of the polygraph examination in the interrogation process of June 7. Appellant's counsel cross-examined one of the interrogating officers as follows:

"Q. Am I correct one of the questions you asked him on the polygraph, did you stab Karen Dockray?

A. I didn't ask the questions.

Q. You were there when they were asked?

A. Right, right.

Q. That would seem to indicate that he was very definitely a suspect?

A. These are normal questions, yes. At this point, like I said, the latter part of the pre-test, the questions are made up from. Now at this point he was giving a description of how this happened and at this point, in my mind, we felt he must have been there, he must have had knowledge.

. . . . . . . .

Q. Now, at this point in taking the test you are tell him, I think you are holding back. You look at this and you look at the results and you say Bill I think you are holding back, I think you were there, is that correct?

A. This was the general result, we felt he had more knowledge. He was there by himself or with someone else.

Q. You told him he was suspect, you thought he was there?

A. At the murder scene.

Q. You told him specifically that you thought after having taken this test he wasn't being wholly truthful and he was there at Karen Dockray's house when she was killed?

A. Right."

At trial, the tapes of the June 7 interrogation which followed the polygraph examination were played for the jury but were edited to omit all reference to the polygraph examination. Thus, appellant was precluded from presenting to the jury, as is his right, his claim that the polygraph examination was used to coerce his confession. This was error. As the Maryland Court of Special Appeals stated:

"A trial judge may not select which circumstances relative to voluntariness may go to the jury and which may not. Once its preliminary determination of voluntariness is made . . . *all* of the relevant evidence bearing on voluntariness must then be submitted to the jury . . . ."

*Johnson v. State,* 31 Md.App. at 306, 355 A.2d at 506 (emphasis in original).

In short, while the use of a polygraph examination during the interrogation of an accused does not necessarily render a subsequent confession involuntary as a matter of law, the jury may consider the procedure so coercive in a particular setting as to declare the confession involuntary. Appellant was entitled to have the jury consider the polygraph examination as a factor in its determination of voluntariness in the totality of the circumstances. I am not convinced beyond a reasonable doubt that consideration of the rejected polygraph evidence would not have affected the jury's determination of the voluntariness of appellant's confession. See e. g.,

616

*Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L. Ed.2d 705 (1967); *Commonwealth v. Boyle,* 470 Pa. 343, 368 A.2d 661 (1977); *Commonwealth v. Bailey,* 450 Pa. 201, 299 A.2d 298 (1973).

Accordingly, I would reverse the judgment of sentence and remand for a new trial.